## MORGAN COUNTY COAL COMPANY, JEPTHA D. RYAN and C. C. MAGENHEIMER, Appellants, v. ANNA B. HALDERMAN, JOHN P. ST. JOHN and ASA L. ROSS.

**In Banc, February 10, 1914.**

1. **OPTION AGREEMENT: Revocation.** The contemplating purchaser of land has the option to refuse to meet the payments called for by an option contract to buy land, otherwise lacking in binding force upon him, and to render it null and void, and as a penalty to lose what he has paid at any given time before the agreement is consummated.

2. **AGENCY: Acceptance of Service.** The owner of land cannot ratify a sale made by a third party, keep the money flowing from it, make the sale a basis for legal relief, and then be heard to disown the said third party or the means by which the sale was made.

3. **SALE: False Representations: Relaxation of Rule: Mineral Land.** The logic of the law, and therefore the law itself, has been slightly colored by the inherent physical difficulties of looking beneath the soil and rocks and seeing the mineral wealth represented to be there. So that a little relaxation of the more stringent rules applicable to cases of fraud based upon false representation where the subject-matter may be seen, is indulged in the application of those rules to alleged false representations in the sale of mines.

4. **———: ———: Things Complainant Must Show.** In order to obtain a decree cancelling and rescinding a contract of sale and a deed conveying land because of false and fraudulent representations made by the owner, complainant must show by clear and decisive proof: First, that defendant made a representation in regard to a material fact; second, that such representation was false; third, that it was not actually believed by the defendant, on reasonable grounds, to be true; fourth, that it was made with intent that it should be acted on; fifth, that it was acted on by complainant to his damage; and, sixth, that in so acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true. The first of the foregoing requisites excludes such statements as consist merely in an expression of opinion honestly entertained; and (except in peculiar cases) it excludes statements by the owner and vendor of property in respect to its value.

5. ——: ——: **Actual Knowledge of Falsity: Reckless State-ments.** Actual knowledge of the falsity of the misleading statements made by the owner or his agent is not an absolutely necessary element in equity in order to justify a rescission of a contract of sale for fraud; if the actionable statements are made recklessly, or made under such circumstances that knowledge will be inferred from them, either from the duty to know or from an opportunity afforded for acquiring knowledge, the contract will be rescinded, if the other requisite elements are present.

6. ——: ——: **Actual Knowledge: Rule at Law and Equity.** Because of the greater harshness of the law and its lack of flexibility, as compared with equity, much stronger proof of actual knowledge of the falsity of material statements, as well as of intent, is required to make out actionable deceit warranting recovery, than is required in a case in equity timely begun.

7. ——: ——: ——: **Immaterial: Laches, etc.** The intent of the vendor in making false representations, and his actual knowledge of their falsity, are not material in the suits to rescind the contract of sale, if the vendee, although being ignorant of their falsity and reasonably believing them to be true, did not act upon them, or if having acted upon them he did not rescind the contract in a timely way without such delay as implies laches. And if plaintiffs took a deed to the 5111 acres of coal land eleven months after they first obtained an option to buy (with no binding obligation on them to buy), upon the representation of the owner's agents to the effect that it was tested and proven coal land and that the whole tract was underlaid with coal from ten to seventy-two feet thick, and during those months they had seven expert coal operators, mining engineers and coal-mining experts to inspect, or drill, or sink shafts, some of them made after they had been warned that the representations were not true and that there was not coal in sufficient quantity to justify extensive mining, it cannot be said that they placed such reliance upon the misrepresentations of the agents as will justify a decree of rescission of the conveyance.

*Held*, by WOODSON, J., dissenting, that the agents made certain material misrepresentations concerning the extent and quantity of the coal underlying the lands, that they were made for the purpose of influencing plaintiffs to purchase the lands and did influence them and they relied upon them, and the mere fact that they reserved the right to investigate for themselves, and did investigate, does not waive their right to also rely upon those false representations, since such representations were a part and parcel of the consideration upon which the contract of sale was

based and being in law fraudulent, the contract itself should be rescinded.

8. ———: ———: ———: **Laches.** Where plaintiffs had free opportunity to make independent investigation of the extent of the coal underlying the lands and did make extensive examination for eleven months before they consummated their option to buy by paying a part of the purchase money, receiving a deed for the 5111 acres of land, and executing their notes for the balance secured by a deed of trust thereon, and during the next two years thereafter drilled six or seven acres and found them barren, leaving the balance unexplored, with no definite information that it is likewise barren, and during the two years continued to exploit the whole for speculative purposes and treat it as their own, when, before the conveyance was made, they could have withdrawn from their option, with little damage to either party, and a prudent man with the information they possessed would have withdrawn, they did not act in a timely way, and are not now entitled to come into equity and ask for rescission. [WOODSON, J., dissenting.]

9. ———: ———: ———: ———: **Status quo.** To justify rescission there must be not only a disaffirmance of the contract at the earliest practicable moment after the discovery of the fraud, but a return of all that has been received under the contract, and a restoration of the other party to the condition in which he stood before the contract was made.

Appeal from Howard Circuit Court.—*Hon. E. W. Hinton*, Special Judge.

AFFIRMED (*as modified*).

*D. E. Wray, Scott J. Miller* and *W. M. Williams* for appellant.

(1) The representations of defendant's agents that shafts had been sunk and coal found at different places upon the tract of land in controversy, and the quality and quantity of coal actually discovered at each of these places, were statements of fact and not mere matters of opinion. False and fraudulent representations of previous explorations and the results thereof furnish ground for the rescission of a purchase of min-

ing properties. Kendrick v. Ryus, 225 Mo. 166; Brown
v. Lead Co., 194 Mo. 704; Turner v. Green, 80 Fed. 41;
Green v. Turner, 86 Fed. 537.    (2) The testimony
clearly indicates that the falsity of the representations
was known to defendant and her agents, and that they
were aware of the results of prior drillings, showing
that actual coal did not exist upon the land as repre-
sented.  It is unnecessary, however, to consider that
question.  Relief on the ground of fraudulent repre-
sentations which will entitle an injured party to equita-
ble relief need not have been made with knowledge of
their falsity.  "Where a party to a bargain makes to
the other party a statement of a material fact, which
he either knows to be false, or which he does not know
to be true at the time when he makes it, and the other
party acts upon the representation to his loss, this
entitles him to equitable relief.  The reason is that it
is against good conscience for a party to keep the
fruits of a bargain obtained by such means."   Florida
v. Morrison, 44 Mo. App. 538; Glasscock v. Minor, 11
Mo. 655; 14 Am. & Eng. Ency. Law (2 Ed.), 94;
Webster v. Bailey, 31 Mich. 36; Warvelle on Vendors,
sec. 224.  "Where one makes, as of his own knowledge,
a false representation, not knowing whether it is true
or false, it is a fraud as much as if he knew it to be
false."   Hamlin v. Abell, 120 Mo. 188; Brokerage Co.
v. Gates, 190 Mo. 391; Derby v. Donahoe, 208 Mo. 700.
It is not necessary to show actual knowledge of the
falsity of the representation in a suit in equity for a
rescission, as is required in an action at law for dam-
ages.  Florida v. Morrison, 44 Mo. App. 538; Lovelace
v. Suitor, 93 Mo. App. 440; Herman v. Hall, 14 Mo.
App. 270.  (3) The defendant cannot retain the fruits
of the fraudulent representations of her agents, and
at the same time escape liability for such misrepre-
sentations.  She cannot hold to the bargain and repu-
diate the means by which it was obtained.  Chase v.

Rusk, 90 Mo. App. 25; Heath v. Shroer, 119 Mo. App. 93; Millard v. Smith, 119 Mo. App. 701; Bank v. Hoeber, 88 Mo. 37; McKinon v. Vollmar, 43 N. W. 800.   (4) It is not necessary that the false and fraudulent representations should have been made at the time the deed was executed and the deed of trust given.   If false representations were made in January, 1903, and these operated in whole or in part to bring about the contract of Nov. 24, 1903, and the subsequent acceptance of the deed and the execution of the deed of trust, it is sufficient.   20 Cyc. 71; Reeve v. Dennett, 11 N. E. 944; Kost v. Bender, 25 Mich. 522; 14 Am. & Eng. Ency. Law (2 Ed.), 198.   It is competent to prove subsequent representations as corroborative of those previously made.   20 Cyc. 602b.   (5)  False and fraudulent representations made to the promoters of a corporation and upon which such corporation acted after its organization, may be made the basis of a suit in its behalf.   Heater Co. v. Heater Co., 32 Fed. 735; Gear & Pulley Co. v. Schoefield, 40 Atl. (Conn.) 1046. (6)   While the false and fraudulent representations complained of must be relied upon by the injured party to constitute grounds for relief, still it is not necessary that they should form the sole or even the principal inducement for the trade.   It is enough if they contributed to bring about the bargain complained of. Hardwood Co. v. Dent, 121 Mo. App. 108; Saunders v. McClintock, 46 Mo. App. 216; Burnham v. Elmore, 66 Mo. App. 617; 20 Cyc. 41; 14 Am. & Eng. Ency. Law (2 Ed.), p. 113, sec. 6.   "If the representation is clearly established, it will not alter the vendee's right of recovery, if after the representation he employed a person in whom he had confidence to examine the cave, and such person reported favorably."  Perkins v. Rice, 12 Am. Dec. 298.   (7)  "If by false representations one actually misleads another to his injury, he commits an actionable fraud, even though some of his representa-

tions are true; and the same result follows, where representations are made, which are in fact true, but are accompanied by concealment of material facts, so that considering the representations and the concealment together, a false impression is produced." 20 Cyc. 24; Lomerson v. Johnston, 20 Atl. 675; Denny v. Gillman, 26 Me. 149. (8) Defendant's agents cannot shield her on the ground that they simply repeated what they had heard from others, if stated by them as facts. Fisher v. Mellen, 103 Mass. 503; Hansen v. Kline, 113 N. W. 504; Buford v. Caldwell, 3 Mo. 477; Hamlin v. Abell, 120 Mo. 188. (9) Plaintiffs were not guilty of laches. The plaintiff corporation certainly would not have invested the money of its stockholders in the payment of $25,000 on the purchase price, and $25,000 more in the grading of a railroad, and several thousand dollars additional in exploration work, if its officers and representatives had known at the time the deed was accepted and the deed of trust executed that the coal did not exist as had been represented. It cannot be successfully maintained that the purpose was to sell to others when the corporation itself had the drilling done by Prof. Ray for the express purpose of determining whether the land contained coal as had been represented by defendant's agents. Certainly there would have been no thorough drilling of this character if the object had been to mislead and entrap innocent parties into buying stock. There was no change in the situation of the parties with reference to the property that would prevent equitable relief. The defendant Halderman, at least, had made no expenditures and had incurred no obligations which would make it inequitable for her to take back the land and refund the purchase money she had received. She, at least, would be in as good position as before the sale. Spurlock v. Sproule, 72 Mo. 510; Real Estate Co. v. Lindell, 152 Mo. 79; Newman v. Newman, 152 Mo. 415; Sicher v. Rambousek, 193 Mo. 546; Witte v. Storm, 236 Mo. 491.

*Samuel C. Major, Black & Black* and *Gage, Ladd & Small* for respondents; *Wollman & Wollman* of counsel.

(1) In a case of this kind, "the court will not act without the clearest proof of the fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was founded upon them." Holland v. Anderson, 38 Mo. 59; Langdon v. Green, 49 Mo. 363; Bryan v. Hitchcock, 43 Mo. 527; Bigelow on Fraud, p. 145; Ludington v. Renick, 7 W. Va. 273; Bement v. LaDow, 66 Fed. 185. (2) If any such statements whatever were made by defendant or agents, such statements were clear matters of opinion and did not amount to representations in law, being representations as to the character of mining lands and what they would produce, said representations pointing out by their very terms that they were made on information and belief and the sources of such information; they were not statements of facts but mere expressions of opinion which do not constitute representations in law. Brown v. Lead & Zinc Co., 194 Mo. 681; Bigelow on Fraud, p. 473; Dawson v. Graham, 48 Iowa, 378; Wilson v. Jackson, 167 Mo. 135; Cornwell v. McFarland, 150 Mo. 377; Lucas v. Crippen, 76 Iowa, 507; Anderson v. McPike, 86 Mo. 294; Development Co. v. Silva, 125 U. S. 247; East v. Worthington Co., 88 Ala. 537; Kinne v. Webb, 49 Fed. 512; Gordon v. Butler, 105 U. S. 553; Franklin v. Holle, 7 Mo. App. 241; Bank v. Hunt, 76 Mo. 439; Warner v. Benjamin, 89 Wis. 290; Tuck v. Downing, 76 Ill. 71. (3) St. John and Noyes having told Magenheimer and Ryan that their information came from third persons, and that they had no personal knowledge other than thus derived, their representations founded upon such information afford no ground for rescission. Moore v. Scott, 47 Neb. 346; Cooper v. Lovering, 106 Mass. 77; Bank v. Trust Co., 179 Mo. 664. If

a person receives information from others and believing the information to be true, honestly repeats the same, explaining that he has no personal knowledge, he clearly is not guilty of fraud. 14 Am. & Eng. Ency. Law (2 Ed.), p. 102; Davidson v. Jordan, 47 Cal. 353; Hillyer v. Dickinson, 154 Mass. 502; Hume v. Brelsford, 51 Mo. App. 651; Robinson v. Flint, 58 Barb. (N. Y.) 100; Christ v. Drie, 18 O. S. 536; English v. Grinstead, 12 Wash. 670. When St. John and Noyes sent the plat to plaintiffs, they told them that they believed that there was an error in it, showing that the plat came from other sources and could not be implicitly relied upon. If a representation, at the time it is made, is accompanied by a qualified statement which shows that the person making it does not intend that it shall be relied upon, and which is reasonably calculated to suggest inquiry on the part of the person to whom it is made, the latter has no right to reply upon it, and, on being deceived, claim that it was fraud. 14 Am. & Eng. Ency. Law (2 Ed.), 117. (4) Even if these statements by these real estate agents amounted to representations in law and were false, yet plaintiffs having had these lands tested by experts and having made thorough investigations regarding them before the notes and deed of trust were executed cannot allege misrepresentations as a defense to these notes. Anderson v. McPike, 86 Mo. 294; Sachleben v. Heintze, 117 Mo. 520; Brown v. Lead & Zinc Co., 194 Mo. 682; 29 Am. & Eng. Ency. Law (2 Ed.), 676. The date of the execution of these notes and not the date of the execution of the first contract is the date to determine plaintiffs' rights in this connection. Sachelben v. Heintze, 117 Mo. 529. Before the notes and deed of trust were executed the Morgan County Coal Company, per Ryan and Magenheimer had been so intimately connected with this property with such ample means of information in regard to it "that they did not rely upon any statements of defendant or her

agents." Ely v. Stewart, 2 Md. 408; Estes v. Desnoyer, 155 Mo. 578; Warner v. Benjamin, 89 Wis. 290; Bryan v. Hitchcock, 43 Mo. 527; Warren v. Ritchie, 128 Mo. 311; Farrar v. Churchill, 135 U. S. 609; Farnsworth v. Duffner, 142 U. S. 43; Plaughter v. Gerson, 80 U. S. 379; Am. & Eng. Ency. Law (2 Ed.), pp. 112, 193; Fauntleroy v. Wilcox, 80 Ill. 477; West v. Grant, 71 Pa. St. 95. (5) Even if defendant and her agents had made positive misrepresentations to induce plaintiffs to enter into the contract of Jan. 15, 1903, yet if the report of Kierstead showed plaintiffs that these representations were untrue, they should have rescinded at once; making a new contract thereafter debars them from relief. Brown v. Land Co., 231 Mo. 166; Taylor v. Short, 107 Mo. 384. And this is so, even though they made discoveries of further misrepresentation afterwards. Booth v. Ryan, 31 Wis. 45; Vernol v. Vernol, 63 N. Y. 45; Dennis v. Jones, 44 N. J. Eq. 513. Magenheimer and Ryan having dealt with his property as their own after having it investigated and examined and drilled by Kierstead et al., and then thereafter having transferred their rights to the Morgan County Coal Company (whose chief officers they were, and which was therefore chargeable with all their knowledge) rescission will not lie. Marshall v. Gilman, 47 Minn. 131; Kruckols v. Lea, 10 Humph. (Tenn.) 577; 14 Am. & Eng. Ency. Law (2 Ed.), p. 111; Simon v. Rubber Co., 105 Fed. 574; Powell v. Adams, 98 Mo. 598. (6) If the buyer trusts to misrepresentations not calculated to impose on men of ordinary prudence, he cannot recover. Dunn v. White, 63 Mo. 181; Clark v. Edgar, 12 Mo. App. 345. Eberhardt says he was ashamed to tell people what he had seen and heard; was afraid they would call him a liar. (7) Plaintiffs not having promptly offered to rescind are barred; having had from Jan. 15, 1903, to Dec. 15, 1903 (nearly one year for investigation) before the final contract was made they cannot obtain relief in equity. Jones v.

Rush, 156 Mo. 375; Price v. Woodford, 43 Mo. 247; Shappirio v. Goldberg, 192 U. S. 242; Lewis v. Land Co., 124 Mo. 672; Thomas v. McCue, 19 Wash. 287; Yeates v. Pryor, 11 Ark. 72; Hart v. Handlin, 43 Mo. 172; Land Co. v. Ewing, 65 Fed. 702; Ready v. Smith, 170 Mo. 174; Melton v. Smith, 65 Mo. 324. Plaintiffs' actions in speculating with the property from December, 1903, to the fall of 1905 debars them from any relief. Dougherty v. Stump, 43 Mo. 243; Vertel v. Smith, 55 Mo. App. 617; Kirk v. Seeley, 63 Mo. App. 267; Estes v. Reynolds, 75 Mo. 563; Tower v. Pauly, 51 Mo. App. 87; Pierce Co. v. Siegel Co., 60 Mo. App. 154; Delano v. Jacoby, 96 Cal. 275; Lierheimer v. Minn. Ins. Co., 122 Mo. App. 374. This rule is of particular application to mining lands as these have a speculative value. 18 Am. & Eng. Ency. Law (2 Ed.), p. 102; Kinne v. Webb, 49 Fed. 512; Grimes v. Sanders, 93 U. S. 62; Grannis v. Hooker, 31 Wis. 474; Hudson v. Cohoon, 193 Mo. 563. Or where the parties cannot be placed in *statu quo*. Brockhaus v. Schilling, 52 Mo. App. 73; Kirk v. Seeley, 63 Mo. App. 262. The petition itself admits that these alleged misrepresentations were discovered to be untrue already in the spring of 1904. Nevertheless plaintiffs went on and speculated still further with the property by having drilling done by Ray. Magenheimer's letter of October, 1903, states that they had made this discoverey already at that time. Cobb v. Hatfield, 46 N. Y. 533; Hunt v. Blanton, 89 Ind. 38; Bennett v. Hickey, 112 Mich. 379. (8) Ryan and Magenheimer's statements that they relied upon the alleged representations prove nothing. Reliance is not a tangible object. It is a state of mind. A case cannot be permitted to pass off on the statement that the party relied on a given state of facts. That would be to allow him to decide the case for himself. Whether or not there was such reliance upon his part must be determined from the peculiar facts in judgment. "A state of mind must be got at and interpreted

through acts, if acts there be." Knorpp v. Wagner, 195 Mo. 638, 665.

FARIS, J.—This action was begun in the circuit court of Morgan county on September 18, 1905. It is a suit in equity to cancel and rescind for fraud a certain contract of sale and a deed executed by the defendant Mrs. Anna B. Halderman to the plaintiff Morgan County Coal Company, conveying to the latter certain lands, alleged to be coal-bearing, as also to cancel certain purchase price notes and the deed of trust securing the same, which deed was made by plaintiff company to defendants St. John and Ross, as trustees, for defendant Mrs. Halderman as beneficiary.

On the application of defendants, a change of venue was granted to the circuit court of Howard county, wherein, on August 17, 1907, an amended petition was filed, which petition alleges in substance that on or about January 15, 1903, the defendant Mrs. Halderman and her agents, St. John and Noyes, in order to induce Magenheimer and Ryan, the promoters of plaintiff corporation, to buy some 5111 acres of land, owned by Mrs. Halderman in Morgan county, Missouri, falsely and fraudulently represented that, by actual drilling, it had been ascertained that "there was a continuous body of bituminous coal under the surface of said ground, from ten to eighteen feet in thickness and extending from the railroad" on the north boundary line of said land, to the "Stover shaft" near the south part of said land. That at the same time defendant and her agents delivered a plat of said land with a circle drawn thereon, showing the coal field as represented by them as existing; that they represented that drilling had been done within said circle, and coal found, and that said circle inclosed the coal fields as actually found and existing; that there were also marks upon said plat, showing (so defendant and her agents represented) the places where shafts had been sunk.

and drilling had been done on said land, and figures showing the actual thickness of the coal found; that these places were eighteen in number, and the thicknesses of coal represented to have been found therein were, respectively, as follows: Fourteen feet, seventy feet, thirty-five feet, thirty feet, sixteen feet, four feet, four feet, seven feet, four feet, four feet, seventy-seven feet, fourteen feet, twenty-five feet, eighteen feet, thirty-five feet, sixteen feet, twenty-four feet, thirty-five feet and six feet. (Running through the middle of this circle on the plat north 'and south was a line marked "E. F." and running through the same circle, east and west, were two lines marked "A. B." and "C. D" and there was a legend in large letters on the plat as follows: "Partly ideal section on line A. B., length of section five miles. Partly ideal section on line C. D., length five miles. Partly ideal section of strata on line E. F., six miles.")

The petition further averred that said representations were wholly false and untrue, and that by drilling done before said January 15, 1903, it had been ascertained that no coal existed where said map showed great quantities of coal had been found, and that drilling had also been done on other portions of said lands, which showed that it was not underlaid with a con, tinuous body of coal, all of which defendant Mrs. Halderman and her agents well knew; that said false representations were made for the purpose of deceiving the plaintiffs; that plaintiffs were ignorant of the facts, and relied upon said representations and believed the same to be true, and said Magenheimer and Ryan were thereby induced, on the 15th day of January, 1903, "to offer to purchase said tract of land from the defendant at the sum of $55 per acre," said offer being in writing and attached to the petition as an exhibit; that modifications were made in said "contract" and finally, to-wit, on the 24th day of November, 1903, said plaintiffs (still relying upon the repre-

sentations and statements of defendant concerning the coal that had been found upon said land, as heretofore set out) "entered into a written contract for the purchase of said land," a copy of which is attached to the petition; that said contract was afterwards, on December 15, 1903, closed, a deed of conveyance of said land made and delivered to the plaintiff corporation, and a deed of trust and notes executed by the said plaintiff and delivered to the defendant Halderman, all the while relying upon the truth of said representations. The language of the petition in that behalf being as follows: "That plaintiff, at the time the contract was made, for said land, and at the time of its purchase, had done no drilling or prospecting upon the said lands and was wholly ignorant as to the discovery of coal thereon, and relied entirely upon the defendant Halderman's statement, and that this was well known to defendant at the time; that after drilling and prospecting on said land, the plaintiff, in the spring of 1904, ascertained that said representations were wholly untrue;" that said land was not valuable for mining and of little value, except a small part, for agricultural purposes; that plaintiffs had tendered back a deed and demanded the notes, and plaintiffs prayed for rescission and cancellation of the deed, notes, deed of trust, etc.

The answer was a general denial, a plea of laches and delay, of a full examination of the property by Magenheimer and Ryan and their experts and agents; that by a contract between the parties of August 27, 1903 (which the petition does not mention), Magenheimer and Ryan had the privilege of exploring and examining said property; that they took possession of said land under said contract and thoroughly investigated the same, by drilling and sinking shafts and otherwise, and through experts of national reputation, and thus being fully informed of the nature and quality of said land, entered into the contract of Novem-

ber 24, for the purchase of said land, and that plaintiffs were estopped by their frequent ratification and their laches.

By way of counterclaims the defendant Halderman set up such of her notes given for the purchase money as were then due (and some which were not due), and asked judgment thereon.

The reply was that the defendant Halderman and her agents after January 15, 1903, continued to make said false representations and thereby plaintiffs were prevented from making a thorough investigation until after the execution of the deed to plaintiff, and plaintiffs prayed for equitable relief as in the petition.

Afterwards in due course, a trial was had before Hon. E. W. Hinton, as special judge; the case was by the learned trial judge taken under advisement, and upon being fully advised, the below memoranda of findings of fact and conclusions of law were made and filed by him, to-wit:

> In January, 1903, C. C. Magenheimer and J. P. Ryan made a contract for the purchase of some five thousand acres of coal lands in Morgan county from the defendant Anna B. Halderman.
>
> The negotiations were conducted between Magenheimer, himself, real estate dealer and investment broker, and St. John and Noyes, specialists in the sale of mining property, on behalf of the vendor.
>
> Magenheimer and Ryan transferred their bargain to the Morgan County Coal Company, organized for that purpose, and the same was closed in the fall of 1903 by a conveyance from the defendant to the Coal Company, which executed a deed of trust for the balance of the purchase money.
>
> Subsequent drillings under the direction of Professor Ray demonstrated that coal was not to be found in paying quantities. The Coal Company now seeks rescission and damages for fraudulent misrepresentations by Noyes and St. John in negotiating the sale.
>
> The charge is easy to make, but difficult to establish, especially in view of the well-known fact that after a bargain has turned out badly, the purchaser is apt to attach undue importance to the optimistic expressions of real estate agents.
>
> Without attempting to review the evidence in detail, my conclusions are as follows:

254 Mo. 39

Coal Co. v. Halderman.

1st. That the agents St. John and Noyes untruly stated the extent and results of previous explorations of the coal.

2nd' That it has not been satisfactorily shown that these statements were made with the knowledge of their falsity or in bad faith.

3rd. That Ryan and Magenheimer relied to some extent on the statements, which were as to matters of fact, in making the original contract of purchase.

4th. That Ryan and Magenheimer made a partial examination of the property in the summer and fall of 1903, and discovered substantial inaccuracies in the representation that had been made to them.

5th. That when the sale was closed by the delivery of the deed in the fall of 1903, the plaintiff, through its officers and promoters, was aware that the extent of the coal had been greatly exaggerated.

6th. That the plaintiff company continued its operations for about a year thereafter until it was conclusively demonstrated that the property had little or no value for mining purposes.

Under this state of facts it is my opinion that the knowledge and notice of the plaintiff in the fall of 1903, required it to repudiate at that time, if at all; that it was sufficiently put on inquiry by the facts discovered and readily discoverable, to require it to then elect whether it would stand by the contract and take its chances, or repudiate *in toto*; the failure of the plaintiff to act promptly had rendered it impossible to restore the *status quo*, in this, that the speculative value of the property has been destroyed and a large amount of timber has been cut from it.

In my opinion the plaintiff should have brought an action at law for damages and for that reason the bill will be dismissed without prejudice to the end that the plaintiff may bring an action at law, if so advised.

The defendant Halderman will have judgment on the counterclaim on the notes due at the institution of the suit.

Upon this finding the court below reached the following conclusions of law, to-wit:

That the plaintiffs were guilty of laches in failing to ask a rescission of the contract of sale referred to in the petition at an earlier date, and that the parties cannot now be placed in the position they were before said sale was made, and that plaintiffs are therefore not entitled to rescind said contract, and that the petition should be dismissed without prejudice to the rights of plaintiffs to bring an action at law for damages, if so advised.

And the court doth therefore find the issues upon the amended petition in favor of the defendants, and doth find the issues upon the first and second counterclaim of said defendant Anna B. Halderman in favor of the said Anna B. Halderman. But the court doth further find that said Anna B. Halderman is not entitled to recover upon the third counterclaim set up in her answer to the amended petition, for the reason that the notes described therein were not due at the time of the institution of this suit.

Judgment was entered accordingly; plaintiffs' bill was dismissed and defendant Mrs. Halderman had a money judgment for $31,920 upon her said counterclaims, with costs of suit. Thereupon, after the usual formal procedure in such case provided, plaintiffs took and now prosecute this appeal.

The testimony was voluminous; the point which is to the fore involves the force and effect of the whole of this mountain of evidence, thus rendering peculiarly difficult the task of carefully and correctly digesting it and of applying it to the law. A survey of the salient facts, comprising a sort of shorthand sketch of the whole case as brief as the facts permit, shows: That plaintiff Christian C. Magenheimer, by occupation an investment broker, at the time residing in Peoria, Illinois, and who then was and all his life had been engaged in buying and selling properties and different investments on commission; whose business was investments; who "built irrigation projects, handled deals, which some people *would call large, and who always tried to buy at the best price," and who tried always to take care of his own interest and himself as best he could,* first learned of the land in question in 1901. Sometime in 1901, Magenheimer had met plaintiff Ryan and tried to interest him in this property. Ryan had been in the coal mining business, as president of a coal company, for a number of years. He seems to have had a varied business career. He had been a farmer, a butcher and a rancher in the West. He says himself he was "taking a flyer" in

this venture. The testimony shows that he had taken similar aeroplane ventures in divers other things, including politics, having been mayor of the city of Leavenworth, Kansas. At the request of Magenheimer, who desired to interest him in coal lands in Morgan county, Missouri, Ryan met the latter, accompanied by one Collier, also a coal mining man of seventeen years' experience, in January, 1903, at Tipton, Missouri, an intermediate point, and with them journeyed to Versailles. At Versailles the party of Magenheimer was met by defendant John P. St. John and one W. W. Noyes, who, as the agents of defendant Anna B. Halderman, are averred to have made the false and fraudulent representations which form the subject and substance of this action. Said St. John, sometime Governor of the State of Kansas, and said Noyes were partners, and for some four years had been such, in the business of handling real estate and coal lands in and around Versailles. After St. John and Noyes had shown Magenheimer and Ryan certain coal property, called in the record the "Hubbard," the "Moore" and the "Bailey" lands, spending a day in so doing, and after the party had returned to the hotel in Versailles, the lands about which this action revolves, the Halderman lands, on which is the "Stover Coal Bank," were mentioned. St. John and Noyes swear that Ryan, having in some manner heard of the fame of the Stover Coal Bank, made inquiry of them about it; while others say, and the weight of the evidence is, that St. John confided to plaintiffs Magenheimer and Ryan the existence of this phenomenon. One Gould, a witness for plaintiffs, who was present when the subject of the Stover Coal Bank was first broached, but who is very unfriendly to St. John, says that the latter first mentioned this proposition. The witness Gould says that in the evening following the return of the party from the Hubbard lands, Magenheimer and Ryan were in the room of the witness at the

hotel; that he had been asked by St. John to "take good care of them" and that he was "caring" for them and furnishing them entertainment of a sort supposed to be forbidden by the political views which had elected St. John Governor of Kansas. St. John came into Gould's room and this witness details the subsequent events thus:

"Governor St. John knocked at my door and he came in with the blue print and told us, 'You have seen the candle coal lands which I deem the best in the country,' and it was arranged to go out the next morning. The Governor did most of the talking; he went on to say that there was a body of coal there, seventy-three feet in depth and that the coal extended out over the country, over a tract of five thousand acres, and that it was proven land (that was always his great statement—*proven land*—he always wanted to show some proven land). The Governor didn't go out with us the next morning, but Noyes went. I heard a conversation between Noyes and Magenheimer and Ryan at the Stover Coal Bank; it was about in line with what the Governor said before. We first examined the mouth of the tunnel which extends into the coal measures, and as I remember it Mr. Noyes stayed at the mouth of the tunnel, and I with Mr. Waldeck went into the drift, or cavern. After we came out, Noyes said, 'Well, we will walk around to another place where I will show you croppings;' he showed the different shafts that had been sunk and he called attention to the shaft that lay to the right of where we were standing, and then we stopped and looked down into some deep holes—very deep; I remember getting a rock and dropping it down there. He said, 'Here is coal that extends all over this five hundred and ten acres,' and he talked in a trend that is in selling lands of any kind. We returned to Versailles together and met Governor St. John there. As near as I can remember, he went on saying something about the number of

acres; that it had been drilled by different parties, and he said, 'You saw the most magnificent thing you ever saw,' *and it was agreed by all that it was true.* 'There is coal all around there,' he said, 'I will show you how many millions of tons there are'—I am not sufficient mathematician to tell how many, because it certainly stumped me at the time. This was before the contract was made, before it was signed. I had had a conversation prior to this time with Governor St. John with regard to this Halderman tract; I had a number of them; there was a conversation that referred to the Halderman tract when I said to the Governor that I heard it was sold; that was some sixty days before the final sale took place. I went up to the Governor's office one day to ask him about the reputed sale of the Halderman tract; it was just after I had assisted in another sale; he said, 'I don't believe they are sold, we've got them, we've got them, we've got it solid, but if they are sold the fellow that gets them has got a gold brick.' That conversation was about sixty days prior to the sale of the place to Magenheimer and Ryan. He further said that there had been a great deal of money spent in drilling and that the pocket was the principal portion.''

This visit to the Stover Coal Bank and the acts, statements and conversations of St. John prior to this visit, and the statements and conversations of Noyes during the visit and while the property was being examined, are detailed by Magenheimer in his testimony thus:

''Governor St. John gave me that plat; showed it to me that evening and gave it to me the next day, and he had it with him when the talk occurred that I have just detailed, and showed it to me. He stated that this property was very valuable property and that it belonged to an old widow lady who lived in the East, who was wealthy but poor in health, and that she was having considerable trouble with her son-in-law, and said

that the property contained bituminous coal, which had
been proved by shafts and drilling—Stover Coal Bank
—and he wanted us to go out the next day and see it
and said that we should not overlook it if we could
buy it. In regard to the marks on the map, he said
those were shafts which contained coal as stated on the
map, and the circle around a certain portion showed
the extent of the bituminous coal basin, and that that
was the heart of the bituminous coal field of Morgan
county. He said that this coal basin was the size of
that circle on the map, and that it was three or four
miles long by two miles wide. I had not at this time
seen the Stover Coal Bank, or Halderman tract. This
evening he said that the coal was there, and he de-
scribed it by *these shafts and diggings and drillings,*
and that it had *been proved time after time, time and
time again by these shafts and drillings;* that he had
lived there seven years and had been over the property
a good many times and knew it was the greatest coal
field in the United States, and he said that Mr. Noyes
had lived there for a good many years prior to that,
and he seen most of these shafts dug and most of the
drillings made. He indicated where the drillings were
made as being inside the circle on the map, and said
that the amount of coal there was from ten to seventy-
three and eighty-three feet in thickness, from the Sto-
ver Coal Bank to the railroad. That would be three
and a half to four miles, the railroad being north of
the mine and the mine south of the railroad. I saw
the property. Governor St. John made arrangements
for us to go out and see the property and we went the
next morning, Mr. Noyes, Jeptha Ryan, Mr. Collier,
Fred Gould and myself. Governor St. John sent Mr.
Noyes out with us. He is the Mr. Noyes that is men-
tioned in the contract which has just been introduced
in evidence, and is a member of the firm. The Gov-
ernor told me that Mr. Noyes was his partner and that
he would show us over this property; that he knew

more about it than he did and seen the coal land and had seen where it had been in testing drills. On the way out I had a conversation with Mr. Noyes in regard to this land, and he said, 'I will show you a property that will surprise you, one of the greatest things you have ever witnessed;' that it was the greatest coal field in the country and as soon as the railroad was completed, it would be ready to be put on the market, and when we went out we went to the Stover Coal Bank—Mr. Noyes didn't go in. The Stover Coal Bank opened in a hillside and you can walk or drive right in, in solid coal. The opening was seven or eight feet, ten or fifteen feet wide, so that you could drive in; they did drive in and loaded coal; you could go in three hundred or four hundred feet that way, and there was nothing but coal there as far as you could see; there was coal on this side and on that, and there was coal in front of you and the floor was coal. The entire party except Mr. Noyes went in there and stayed the entire one hour or more; and it was one of the greatest sights you could see; you could see twelve to fifteen feet of coal, on all sides of you, you were on coal at the bottom and could see coal at the top, and there was coal on both sides. There was a shaft at the top, about at the end and the entrance was fifteen feet high; the rooms in there were as big as this one, solid coal, everything was coal around you; everything that you could see was coal. It was bituminous. The coal at the bottom made the floor of this Stover Coal Bank. When we came out Mr. Noyes was there, and he said, 'What do you think of it?' and I said that I thought it was the greatest sight I ever saw, and he went on the top and showed us the old shaft, and said there was seventy-three feet of coal there and that there was shafts all over, all the way from there to the north end of the property; that was about four miles; that there were shafts opened, and that he had been down in a good many of them and had seen them dug, and he

knew by the drilling down there by a man by the name
of Gunn that had done drilling there, and he said that
this coal continued from there to the railroad, the
upper end of this property; and we could ask him about
the different shafts, if could get in them, and he said,
'No,' that they were 'full of water and caved in;' I
saw some of these shafts and they were full of water
and partially caved in, and there was coal on the dump.
He said that there was not a hole dug on that property
that did not show coal, and the least that he had any
knowledge of was ten feet up to seventy-three feet,
fourteen, twenty-five and thirty feet at different places;
that it was tested enough so that it was proved that it
extended from the Stover Coal Bank to the river.''

As a result of and following the visit to the Stover
Coal Bank as detailed by the witness Gould, and by
Magenheimer, Ryan and the latter became very en-
thusiastic about it, and almost at once, after they got
back to Versailles, they submitted to St. John a writ-
ten proposition to purchase the whole Halderman tract
of 5111 acres.  They were told by St. John that while
he ''had an option from Mrs. Halderman'' authoriz-
ing him to sell the land, the cash payments proposed
by them were so much smaller than those he was per-
mitted to accept, that he would have to submit their
offer to Mrs. Halderman in person for her approval.
Thereupon the written proposition submitted by
Magenheimer and Ryan, was embodied in a more
formal option, which option is as follows:

Versailles, Mo., January 15, 1903.

St. John & Noyes,
    Versailles, Mo.
Gentlemen:
    We hereby submit to you as the agents of Mrs. A. B. Hal-
derman, the following proposition for the purchase of her 5111
acres of land, situate in townships 41 and 42 in ranges 16 and
17 in Morgan county, Mo., and commonly known as the Hal-
derman or Stover land, upon which is situated the Stover Coal
Bank. We will pay $55 per acre for the land, as follows:

Coal Co. v. Halderman.

$500 down, for which we herein enclose check.
$4500 sixty days from this date.
$5000 one hundred and twenty days from this date.
$25,000 two hundred and ten days from this date.
$46,105 three hundred days from this date.

The balance, to-wit, $200,000, in five equal annual pay-ments of $40,000 each, to bear five per cent interest per annum, interest payable annually. On payment of the said sum of $5000 one hundred and twenty days from date hereof, you as such agents to procure and deliver to us abstract showing a perfect chain of title to said land, from the State or United States Government down to the said Mrs. A. B. Halderman. We to examine and note our objection, if any thereto, and return the same to you within forty days thereafter, and you as such agents to have said objections or errors as the case may be, corrected on or before the maturity of said payment of said sum of $25,000 and return said abstracts to us. Upon payment of said sum of $46,105 Mrs. Halderman to make, execute and deliver to us, or such person or persons as we may name, a good and sufficient warranty deed conveying to us or such other person or persons we may direct, a perfect title to said land, and the grantee and grantees named in such deed, will make, execute and deliver to said Halderman or such person as she may name, negotiable promissory notes for said sum of $200,000, as above stated, secured by deed of trust duly signed and acknowledged, on said land. We have made and signed duplicates of this proposition, and you shall have seven days in which to secure the written acceptance of same by Mrs. A. B. Halderman. Such acceptance to be on each of these copies, and you retaining one and returning the other to us. Time shall be the essence of this contract, and if said payments are not made promptly as above stated, whatever may have been paid by us shall be forfeited, and this contract shall be null and void. Upon payment of said sum of $25,000 due 210 days from the date hereof, we to have full possession of said land. We reserve the right to pay any or all of said money, at any time, provided we are not in default. We shall not be put in default by reason of failure of Mrs. Halderman to comply on her part with the conditions herein stated.

JEPTHA D. RYAN,
C. C. MAGENHEIMER.

I hereby accept the above proposition.

A. B. HALDERMAN.

The five hundred dollars in cash were paid, and St. John took this document to Mrs. Halderman, who was at the time at Hot Springs for her health, and she there

accepted it as shown above. Immediately thereafter, to-wit, on February 27, 1903, Ryan and Magenheimer proceeded to organize the plaintiff Morgan County Coal Company, which they incorporated under the laws of the State of South Dakota, with a capital stock of $3,000,000. On the 2nd day of August, 1904, and long subsequent to the happening of a majority of the facts and acts in this action complained of, the plaintiff corporation was licensed to do business in Missouri. It was using the *whole of its* $3,000,000 *capital* in this State. This capital then consisted, to quote Magenheimer, of "the equity in the Halderman tract, an option on the Hubbard and Moore mines and the Hudson and Bailey land and on *this Halderman tract we had paid five hundred dollars;*" plus the subsequent payments made on the purchase price of the Halderman land, alleged by plaintiffs to be $39,500.

After plaintiffs Magenheimer and Ryan had incorporated the Morgan County Coal Company, they became very active in endeavoring to sell stock in this company. Prior to this they began the collection of material and data from which to prepare a prospectus, which they afterwards issued, and Magenheimer wrote this letter to St. John and Noyes:

Peoria, Ill., February 23, 1903.

St. John & Noyes,
    Versailles, Mo.
Gentlemen:
    I am very anxious of getting the photographs of the Stover Coal Bank. I want a number of them and as I told you over the telephone I would very much like to have a team and wagon inside of this bank loading coal or with a load of coal on it. Please have the photographer rush them to us as soon as possible as we are getting out a prospectus and are going to sell stock in a few days. I do not think it will take very long to swing the entire deal.

Very truly yours,
C. C. MAGENHEIMER.

A few days later Magenheimer wrote another letter to St. John in which he used this language:

Coal Co. v. Halderman.

Mr. Frank Collier and Mr. James Taylor will be there tomorrow. Mr. Taylor is our State Mine Inspector. *He is going to make a thorough examination of this land for Mr. Ryan and I.* [*Sic.*]

I note what you say about the photographs. I hope that you will hustle them and get them here at the earliest possible moment.

*Now the success of our deal practically all depends on his report.*

About this time some unknown but officious person advised Ryan that this land could have been bought for $12.50 per acre. So, on February 28, 1903, Magenheimer wrote St. John and Noyes that he "would not give them the name of the party making the statement of $12.50 per acre; this was told to Mr. Ryan by some of the parties that were down with him the last time. *But we do not care for this, if we can have the time and chance to swing this, we will do so upon the inspection and report of our Mr. Taylor.*"

In his testimony he explains this excerpt from his letter by saying that "some parties told Ryan that he had paid too much for the land; *that they could have got it for us at twelve dollars and a half an acre.*"

Under date of February 23, 1903, one C. M. Griever, describing himself as a civil engineer, made a report to Ryan of his examination of this land. On March 5, 1903, one James Taylor, who is described by plaintiffs as "the well-known Peoria county mine expert and at present State Inspector of Mines," examined this land and made report of his findings to plaintiffs which report was of such value that plaintiffs took the precaution of having it copyrighted. One Frank J. Collier, who is described by plaintiffs "as one of the best known coal miners in central Illinois," also examined this land and made a report on it to the plaintiffs. These examinations and reports were made before the issuance of a certain prospectus, which was promulgated for the purpose of selling stock in the

plaintiff company. This prospectus covers some twen-
ty-two pages of the printed record, and throws so much
light upon the motives of the parties to this action that
it is regrettable that it cannot be here inserted in full.
Taylor, the mining expert of plaintiffs, in his copy-
righted report, which is set out in this prospectus at
length, says, among other things:

> Complying with your request of recent date, I last week
> made an inspection of your property located in Morgan
> county, Missouri. This was done in company with Mr. Frank
> J. Collier, a retired coal operator of Peoria, Ill. We drove
> from Versailles overland in a southerly direction some twenty
> miles and on section 18, township 42, range 16, we found in-
> dications of coal.
>
> As a part of this report, I hand you herewith a map of
> Morgan county, marked with circles of red ink, showing the
> location of inspection. In the lands embraced in each of these
> circles I found indications of coal from five to sixteen feet
> below the surface. . . .
>
> It is impossible to estimate the value of this coal pro-
> ducing property. While practically it is a pocket, yet it is a
> magnificent one, ranging from 50 to 75 feet in thickness of the
> best bituminous coal. I found no difficulty in tracing it for a
> distance of seven miles from east to west. The proximity of
> this great coal field and the immense lead ore deposits renders
> it valuable beyond computation, and yet its development has
> not yet begun. The deposits of coal through your property,
> as above named, are undoubtedly extensive pockets which can
> be readily stripped and the coal loaded direct into railroad
> cars. These deposits will afford a valuable supply of fuel at
> a minimum price. In my judgment there is no doubt that your
> realty named above is underlaid with coal from 50 to 75 feet
> in thickness.

One Thos. C. Ryan, a brother of plaintiff Ryan,
and an experienced coal operator, also investigated
this property for the plaintiffs, sometime prior to the
issuance of the prospectus. His report, as contained
in this brochure, says among other things:

> In conclusion I beg to say, as a result of my observation,
> I find the properties to be even better than represented.

Plaintiffs in their prospectus did some little figur-
ing of profits which would reasonably accrue to those

who bought the stock of plaintiff company, and so figuring reached this deduction:

> We learn that a small company in the interior of the State of Illinois has a daily output of 6000 tons of coal per day, so taking this as a basis we arrive at the following figures:
>
> One day's output of 6000 tons at the conservative price of $1.25 per ton f. o. b. cars at mine would be $7500. On a basis of 200 working days (which is also conservative) would make a gross earning for the year of $1,500,000. Deduct therefrom the cost of mining and handling, estimated at 25 cents per ton, $300,000. Show a net profit for one year of $1,200,000 or 40 per cent of the capitalization. The number of working days will amount to nearer 260 days per year, and to increase the output means only the employment of more labor and in that event the profits would be materially increased.

Plaintiffs also set out in this prospectus many other puffing, not to say flamboyant, letters, reports and statements as to this land as a coal-bearing and mining proposition.

At some time in May, 1903, one Griffith, who is referred to throughout the record as a "distinguished coal expert and mining engineer," examined this land, primarily for the purpose of inducing one Carrier, a capitalist, to invest in the stock. Griffith seems to have been employed on his first visit by Carrier, who by the way, did not invest. Later, Griffith again came down and made a second inspection of the land for plaintiffs. His report was not offered upon the trial, though St. John testifies that he was told by Magenheimer that "Griffith was one of the most eminent experts in this country, which is true, and *whatever Mr. Griffith's report would be would determine the question as to whether they took the land or not.*"

Magenheimer says that Griffith was paid for his services on his last trip by plaintiffs, but that he is sure he made no written report. Of his verbal report Magenheimer says:

His report was favorable and unfavorable; he said that
the Stover Coal Bank and the Burkhart and the McKinley
shaft all showed that the property was worthy of further in-
vestigation and if coal continued, as he thought it did, we had
a good property, but that we would have to go on further, and
that from the drillings Mr. Kierstead had done on the north
end it showed that the coal did not extend that far, but that
if the other shafts turned out as expected, it would be all
right. The north end was the end that St. John told us it
extended to and Mr. Griffith advised us that that was not
the case; and I received this information, he told me that
I didn't need to be discouraged about that; that it was on
the upper edge, and that was liable to happen at any coal field.

Between January 15, 1903, and August 14, 1903,
the date at which under the option the sum of $25,000
was due, plaintiffs Ryan and Magenheimer paid $9,-
500, which with the $500 already paid, made $10,000
in all paid by them. They did not pay this $25,000 in-
stallment when due, but through one Kierstead, who
as their agent went on to New York to confer with Mrs.
Halderman, obtained, with the aid of St. John, "an
extension" and "a permit to drill the property."
When this paper (which we style as the witnesses
style it, "an extension," but which was in fact a sup-
plemental contract) was executed, plaintiffs were two
weeks in default in their payments. This supplemental
contract is important, and it follows:

It is hereby agreed, by and between the undersigned
parties hereto, that the time for the payment of twenty-five
thousand dollars installment mentioned in the contract to
which this is attached, shall be, and the same hereby is, ex-
tended for a period of sixty days from this date, and a like
period is given in which to furnish the abstracts, referred to
in the original contract to which this is supplementary. It
is also agreed that, during said period of sixty days, the said
Magenheimer and Ryan shall have the privilege of developing
coal and mineral on said five thousand one hundred and eleven
acres, referred to in said original contract, at such place, and
in such manner as, in their judgment, may be best for all
parties concerned. *The Stover Coal Bank is not included in
this privilege, but shall remain intact, except that the said
Magenheimer and Ryan may take therefrom such quantity of
coal, and no more, as may be necessary to test quality of
same.*

Coal Co. v. Halderman.

It is also agreed that, upon payment of said twenty-five thousand dollars promptly, according to the extension above given, the said Magenheimer and Ryan shall be entitled to full possession of said five thousand one hundred and eleven acres of land, subject only to the rights of the several tenants on the farms on said land; and, the said Magenheimer and Ryan shall be entitled to receive, upon taking posession as above, the unpaid rents for the year 1903.

It is further agreed that the said A. B. Halderman shall make, and acknowledge in due form, a general warranty deed, for said land, properly describing the same therein, and leaving the names of the purchasers, and the amount of consideration, blank, to be filled in, as directed by the said Magenheimer and Ryan, or their assigns, upon payment of the next installment to fall due, under said original contract, amounting to $46,105, and the making and delivery to the said Halderman the notes, secured by deeds of trust as in said original contract provided.

It is also agreed that the said Magenheimer and Ryan, or their assigns, may pay at the time of maturity of said forty-six thousand one hundred and five dollar installment, all the said purchase money remaining due, as provided in said original contract (and a certain letter of St. John and Noyes, dated August 25, 1903, the essence of which letter makes the net price to A. B. Halderman as $47.25 per acre instead of $45 per acre as per original contract with her), or the same may be paid at any time prior thereto, and deed delivered as aforesaid. It is understood and agreed, that the said Magenheimer and Ryan may use such timber on said land as may be necessary in making the development as aforesaid.

It is further agreed that upon failure to pay said twenty-five thousand dollars, as above stipulated, the said Magenheimer and Ryan shall vacate said premises; but they may take with them such machinery and other appliances used in making such developments.

It is fully understood and agreed, that the said A. B. Halderman shall not be called upon to pay any of the expenses of such development, nor be in any way liable in connection therewith.

Witness our hands this 27th day of August, 1903.

A. B. HALDERMAN,
RYAN & MAGENHEIMER,
    By GEO. W. KIERSTEAD.
JEPTHA D. RYAN,
    By GEO. W. KIERSTEAD.
C. C. MAGENHEIMER,
    By GEORGE W. KIERSTEAD.

Plaintiff Magenheimer says that one reason for this extension was to afford opportunity to drill the land, that Griever (he means Griffith) had said to him, "By all means it ought to be drilled; that was the time the contract for payment was extended by Mrs. Halderman. I told her unless I could show up the property to Griffith I could interest no capital."

Following the execution of this document, plaintiff Ryan, with the assistance of one G. W. Kierstead, above mentioned and who is described by Ryan as "a coal expert and is considered as an engineer," began to clear out the old coal shafts and diggings and to drill the land so as to locate the depth and exent of the coal thereon. Kierstead drilled in all some seven holes on this land in the six or seven months during which he was in the employ of plaintiffs, prior to the final consummation of the deal and the actual purchase of the land. As to what Kierstead did and found and said to his principals, the plaintiffs, he, testifying by deposition taken by plaintiff, but offered by defendants, says:

The first trip I was down there with Mr. Carrier and Mr. Griffith, to the best of my recollection, was during the month of May, as I remember now, between the 10th and 25th. I made a trip to the property covering several days duration and during this trip I was introduced to and met Mr. Carrier of Buffalo; I put in a good portion of six or seven months down there, commencing probably in April or May—not every day, but I was there a good many days at a time, running back and forth. I put in several days on this trip, that is from the 10th to 25th, preparing myself to show the property to Mr. Carrier, and in going over it with him, in fact, most of the month of May was put in in the interest of the property, so I infer I was there practically all of May; I was investigating the property; I examined them so far as the surface condition was concerned to the best of my ability and assembled all the data and made maps and got my notes for maps and records, and examined the records as to getting at the details of the ownership of the property. I made inquiries of natives and others as to the diggings that had been made there, of

254 Mo. 40

all the natives that I could get hold of; the woods are full of them; I inquired of all of them as to what had been done there in the way of sinking shafts and where they were and where located, to the best of my ability; and that took nearly the whole of the month of May; I found that they were investigating properties that did not belong to Mrs. Halderman, at all, and when I discovered that, I made it a point to discover what properties she did have in order not to investigate something not in the properties; I reported to Mr. Ryan that this property alleged to belong to Mrs. Halderman did not belong to her; that was reported to us in good faith; it was simply an error; I simply told Mr. Magenheimer that some of these properties were not hers, that they were supposed to be hers; they had been pointed out by St. John and Noyes as a part of the property, and I pointed out to him that that was a mistake, to Magenheimer and Ryan. I think I told them that in May; I made this statement in justification of the time I consumed, and when I found out they were properties not pertaining to the matter, then 1 found the whole thing was chaos from start to finish, from the time I first put my fingers on it. . . . On September 2nd, I went with Mr. Ryan out to the property. Immediately upon my arrival at the property, September 1st or 2nd, I inspected the old openings that he had cleaned up and made general inspection and arranged for further inspection of other openings and starting of drills as was in accord with the agreement made with Mr. Griffith in order that he could make his supplemental report; Mr. Griffith was to come back and look at the property, and Mr. Ryan and myself were opening up all of the old shafts and making new holes to assist him in making that further investigation; this feature of it was not preliminary, but actual work of the investigations of the statements that had been furnished me; it was investigation, and as far as possible, Mr. Ryan was investigating and cleaning up the old places because immediately upon my arrival at the property, I inspected the old openings that he had made and made such inspection of their other openings. . . . From the day of my arrival, September 2nd, I remained there continuously doing the work of investigating until October 10th; I put in my entire time going over the property and investigating the openings that had been made, that Mr. Ryan had cleaned out in my absence and in directing others to be opened, new shafts to be sunk and to the best of my recollection making contracts with drillers and starting drills. I know I did that work between that and the first of next December; that is when I started it, between the 2nd and 10th. I could not give the dates exactly; it was before the 1st of December. I had seven drill holes put down at different points.

This witness Kierstead also says that he found that many statements made by Noyes as to the location of shafts on the Halderman lands, and as to the coal in such shafts, were erroneous, and had been by Noyes misrepresented; that this was the case in the Runyan, Porter and Whiskey shafts; that these shafts were either not on the Halderman lands, or were not as represented by Noyes, and that of all these things he fully advised plaintiffs.

Regarding Griffith, who was apparently a very able, painstaking and honorable mining engineer, and coal expert, and his work there, St. John testified as follows:

> During that sixty days extension, Mr. Griffith came down and I had a talk with Mr. Magenheimer and Mr. Ryan as to why he was coming; they said the question whether they would take the land would depend on Griffith's report. He made an investigation, was there eight or ten days; Mr. Magenheimer told me at one time that he was making a report, but it was not completed, and I think he gave me the advance sheets of his report; and that is attached to my deposition; I am not sure that it is in his handwriting, but it looks like it. Mr. Magenheimer said it would depend on Mr. Griffith's report.

The minutes of Mr. Griffith's report referred to in Mr. St. John's testimony are as follows:

> It is not claimed neither is it at all probable that within the area there is not barren ground. That there are whole stretches wherein little of value exists, is almost certain. All experiences in mining point that way. Yet making all reasonable allowance for faults and barren regions, there lies right here in this block enough coal to inspire the highest confidence and justify the investment of many times the sum required to acquire and develop a paying proposition out of these fields that will undoubtedly pour forth a steady stream of coal for a half century.
>
> The time to make an investment is while the enterprise is shaping itself, not after it has reached its perfected form. It is difficult to make investors understand that the formative period of an enterprise is the ground floor period where large returns are made on a small original investment.

On October 12, 1903, Magenheimer wrote Mrs. Halderman as follows:

Dear Madam:

Since our return from N. Y. we have been very busy making investigation of the lands under contract. We have been very much delayed in our work on account of circum-stances over which you or we have had no control.

While the drilling and shaft cleaning on the north part of the property have been far from satisfactory to us, we are not entirely discouraged for the reason that we have had some good results on the south part. We are still pushing the development work and have hope of further good results on the south.

The north part, however, the work done has proved that coal does not exist in quantities—or quality to justify oper-ating as a commercial proposition.

In the meantime, that is to say, between September 1, 1903, and December 15, 1903, Magenheimer and Ryan had succeeded in getting one F. C. Eberhart of Mishawaka, Indiana, interested in this land, and in the end sold to Eberhart one-half of the stock for $50,000, and the further agreement that Eberhart would furnish in a way left nebulous and vague in the record, $100,000 more for developing the property.

Sometime prior to the making of the contract of November 24, 1903, Magenheimer had a conversation with Mrs. Halderman, the defendant here, the owner of the land in controversy, who was an aged widow, residing at the time in Brooklyn. According to Magenheimer she said to him:

She invariably insisted that I should put up more money down on the property; she said that I had a property there that was worth millions of dollars and was controlling it with a small amount of money, and she said that she didn't hesitate to let me have it, if I was sure that I could go through with it, and she said that she had it examined by different experts and had it reported on, and she knew it was valuable land, valuable property, but owing to her age and health, she was disposing of it and could not work it; she said that fifty-five dollars an acre was a small price for it. She assured me that she had reports of this property made by different experts

Coal Co. v. Halderman.

locked up in her trunks; she had searched but had lost the
checks to the trunks so she could not get them, and she said
that the reports showed that she had a very valuable property
there.

Ryan, who testified for himself and his coplain-
tiffs, admits that they were taking what might be
called a "flyer" in going into this transaction, and
also that he understood he was making a speculation
there in a certain way like all mining and "all mining
is speculation." Ryan also says:

Taylor, the state mine inspector of Illinois, gave it as his
opinion that the land was underlaid with probably 50 feet of
coal. St. John said to me at that time that such a report as
that would do more harm than good, and used words to the
effect that it was not reasonable to believe any such exagger-
ated statement. I was in Versailles most of the time after
August for probably two or three months, off and on, and was
down there probably two or three months between February
and August, or January and August; I may have been more;
I may have been half a dozen. I probably had talks with others
about these coal mines during these visits. I spoke to pretty
near everybody in that country trying to find out something.
. . . I don't know how many parties I spoke to in that way.
I spoke to everybody that was around there; four or five or six,
or half a dozen; maybe a dozen. I did speak to people down
there between January and November of that year; I spoke
to everybody living around there; we talked about coal, timber
and ties and everything else. . . . These parties around
Versailles that I spoke to told me it was reported that there
was a great deal of coal around there; the general impression
was that there was coal around all through that country.

Following these divers dealings and investiga-
tions, on November 24, 1903, the plaintiffs Magen-
heimer and Ryan of the one part and the defendant
Anna B. Halderman of the other part, made this agree-
ment:

This agreement made and entered into by and between
Anna B. Halderman of the first part, and J. D. Ryan and C. C.
Magenheimer of the second part, witnesseth:

1st. It is hereby agreed by the parties hereto, that on or
before the 15th day of December, 1903, the said party of the
first part shall make, execute and hold in readiness to de-

liver a good and sufficient warrantee deed conveying a clear title to 5111 acres of land in township 42, ranges 16 and 17, and township 41, ranges 16 and 17, in Morgan county, Missouri, known as the Halderman or Stover Coal Bank tract, being the same property embraced in contract made between the parties hereto on the 15th day of January, 1903, that said warrantee deed shall contain the general usual covenants for free and unencumbered title, except only the rights of the several tenants on said land. Said deed shall be made to the Morgan County Coal Company, a corporation duly organized. It is also agreed that the parties of the second part hereto will pay the taxes on said land for the year 1903, and shall receive the rents due from the tenants thereon.

2nd. It is agreed by the parties of the second part that the said Morgan County Coal Company by its duly authorized officers shall make, execute and deliver to the said Anna B. Halderman or her authorized agent simultaneously with the delivery of the said deed, the promissory notes of the Morgan County Coal Company, a corporation duly organized, as follows:

$2,000.00 cash upon the delivery of the deed.

$2,000.00 thirty days thereafter.

$2,494.75 sixty days after delivery of the deed.

$10,000.00 on or before January 20, 1905.

$15,000.00 on or before July 20, 1905.

$40,000.00 on or before July 20, 1906.

$40.000.00 on or before July 20, 1907.

$40,000.00 on or before July 20, 1908.

$40,000.00 on or before July 20, 1909.

$40,000.00 on or before July 20, 1910.

Each of the said notes to be payable to the said Anna B. Halderman or order, and to bear interest at the rate of five per cent per annum, interest payable annually. That all of said notes shall be secured by a deed of trust made in accordance with the laws of the State of Missouri on all of said lands, with power of sale of said lands in case of default in payment of any one of said installments upon giving thirty days' notice, as provided by the laws of the State of Missouri. The trustee in said deed of trust to be named by the said Anna B. Halderman.

3rd. It is further agreed that the said parties of the second part will by contract with Eberhart Brothers of Mishawaka, Indiana, to provide for the placing within the next thirty days of forty thousand dollars in the treasury of said Morgan County Coal Company to be expended in the building of a railroad or spur from the Rock Island system down into the coal mines on said land, and for machinery and other means of developing said property and putting the coal it contains on the market.

It is further agreed that the said Morgan County Coal
Company shall do no promiscuous drilling for coal or mineral
on said lands, but may do whatever in the judgment of the
officers of the said company may be necessary from time to
time to develop coal and mineral for the purpose of opening up
and operating, no drilling until after this contract is consum-
mated.

4th. It is further agreed that as a condition precedent
to the delivery of said deed, notes and deed of trust, that the
said parties of the second part, or the said Morgan County
Coal Company, shall pay to the firm of St. John & Noyes of
Versailles, Missouri, the sum of ten thousand dollars, which
said sum shall be in full of all their claims for commissions
in making such sale as stipulated in the option they hold from
the said party of the first part. And that the said Magenheimer
and Ryan, or the Morgan County Coal Company shall also
procure a statement from C. W. Waldock to the said St. John
& Noyes releasing them from all liability on account of any
commissions or claims that he may have against them for any
and all services that he may have rendered in procuring the
said Magenheimer & Ryan as purchasers of said property.

Signed in duplicate by the parties hereto, this 24th day of
November, 1903.

ANNIE B. HALDERMAN.
JEPTHA D. RYAN.
C. C. MAGENHEIMER.

Witness:   JOHN P. ST. JOHN.

On the 8th day of December, 1903, defendant
Anna B. Halderman made and subsequently delivered
to Morgan County Coal Company a warranty deed
conveying all of the 5111 acres of land here in contro-
versy, and thereafter said plaintiff, Morgan County
Coal Company, executed and delivered the notes and
deed of trust here sought to be cancelled and annulled,
to defendant Anna B. Halderman. Of this sum of
$229,494.75 secured by this deed of trust and evidenced
by these notes, only the sum of $4494.75 seems to have
been paid. Plaintiffs therefore paid $10,000 before the
making of the supplemental contract of August 27,
1903; $10,000 to St. John and Noyes for an assignment
of their claim for commissions and the sum of $4494.75
above set out; altogether an aggregate of $24,494 75 on
the purchase price of the land.

Coal Co. v. Halderman.

The proof seems to show that the land was worth for grazing and agricultural purposes about ten dollars per acre. After the making and delivery of the deed of warranty and the deed in trust and the notes, plaintiffs had the land carefully examined, tested and at least 600 acres of it drilled. This examination disclosed that the land was and is practically worthless as a commercial coal mining proposition. Large sums of money were spent by plaintiffs in demonstrating the fact of worthlessness; and when such fact was demonstrated to the satisfaction of plaintiffs in the spring of 1904 as they in their petition aver, plaintiff corporation, through Magenheimer, its secretary, began dickering to lease the land or to buy it at a largely reduced price. To this end he wrote this letter to St. John:

Hotel Earlington,<br>New York, Dec. 20, 1904.

Dear Governor:

I just returned from *Mrs. H. She was much surprised* and to make a long story short she said I should keep mum and not even let you know anything. She is willing to make the lease and she has referred me to Mr. Ross. She is going to write him and do the business through him. I told her Mr. Ross was satisfactory to me. Please tell Mr. Ross I will be down between Xmas and New Year. I will then execute the lease with the Penna people. If I can get the coal and all mineral. I guess they would rather lease in that way. I will push the work just as I have heretofore and redeem the country if it can be done provided I can get everything shaped up so it will justify me in doing so. I will spend Xmas in Indianapolis. Please write me at St. Louis and my mail will be fwd. to me.

Yours sincerely,<br>C. C. MAGENHEIMER.

And on 6 January, 1905, this one to defendant Ross:

MORGAN COUNTY COAL COMPANY.

Mines Located at

Versailles, Morgan County, Mo.

Address all correspondence to

Rooms 416-417 Frisco Building,

St. Louis, Mo.

St. Louis, Mo., Jan. 6, 1905.

Mr. A. L. Ross, Atty.

For Mrs. A. B. Halderman,

Versailles, Mo.

Dear Sir:

As per your request I write you the conditions upon which we are willing to make a lease.

1st. We have to have a lease for twenty-five years or as much longer as mineral exists.

2nd. We to pay a royalty of 6 per cent on gross value of zinc, lead and other minerals excepting coal.

3rd. We to pay monthly a royalty of three cents per ton for all coal produced.

4th. We to have right to use wood, coal and timber on said land for mining, building, fuel for the switch buildings necessary for mining and conveying said mineral or coal free of cost.

5th. We to have right to build railroad switches, trams and right to remove any and all of them at any time.

6th. We to have warrantee deed to any land used for railroad switches.

7th. We to have a right to build coal tiplers, storage houses, laborers' houses or any buildings necessary for mining purposes, and the right to remove any and all buildings or equipments at any time.

8th. All work to be done at cost of coal company.

9th. One-half of all royalties to be withheld by coal company until a sufficient amount has accumulated to offset amount which previously has been paid on purchase price of property. I stated to you, also to Mrs. Halderman, that this must be done at once for reason explained regarding railroad and publicity.           Yours truly,

MORGAN COUNTY COAL CO.,

By C. C. MAGENHEIMER, Secy.

And being now convinced that the *surprise* of Mrs. Halderman referred to in the letter, supra, had had a chance to wear off, on the 21st of March, 1905, Magenheimer wrote thus to St. John:

MORGAN COUNTY COAL COMPANY.

416-417 Frisco Building,

St. Louis, Mo.

OFFICERS:

F. G. Eberhart, Jr., Prest.

G. J. Magenheimer, Vice President.

E. G. Eberhart, Treasurer.

C. C. Magenheimer, Secy. and Genl. Mgr.

Telephone Bell Main 155.

St. Louis, Mo., March 21, 1905.

Hon. John P. St. John,

Versailles, Mo.

Dear Friend:

Yours of March 16th received and noted. I will be glad to hear what Mrs. Halderman has got to say. I have Prof. Ray's report in detail showing results of drilling. If you wish to see it I will send it to you. It will surely take the starch out of Mrs. H. if she reads it; she will some day run after me to help her with this property. It would be of great value to her if this report was kept secret, which will not be unless some arrangement is made with me.    Yours truly,

C. C. MAGENHEIMER.

Nothing came of these Magenheimer offers and on the 18th day of September, 1905, this action was commenced in Morgan county; taken to Howard by change of venue; tried there; and plaintiffs being cast, as stated above, they have appealed and are here now strenuously urging error.

If other facts are necessary to be stated, after so far transgressing the rule enjoining brevity, they will be found in the subjoined opinion.

## OPINION.

I. The main contention vexing us here is whether the judgment *nisi* is against the law and the evidence. This point variously, and in diverse verbiage couched, is *punctum saliens;* other minor matters, though set out in the motion for a new trial, being passed over in the briefs filed and in the argument, *sub silentio.*

Among the multitude of witnesses and in the mountain of matter drawn from them and preserved in

the record, great difficulty has been experienced in getting the facts. Uncalled for verbosity and looseness of expression have with many witnesses jostled elbows with pride of opinion and in cases an evident desire to vaunt themselves, or to exculpate themselves, lest their careless, or grasping prior acts, should seem to darken professional reputation or throw a shadow upon their standing for discretion and business judgment.

It is not of moment, in the view we take of it, to consider deeply whether Mrs. Halderman had or had not knowledge of the worthlessness of this land as a coal mining proposition. We quote **Sale: Representations.** above what she said, and all she said to Magenheimer. These representations were true in the main, and where not true adhere to the genus "puffing," and *ergo* are excusable. She said she had reports of experts showing the great value of this land; she offered these reports in evidence and they were as rosy as the reports of plaintiffs' experts, which to say, is to pay them a great compliment. Other evidence in the case, however, leads by large inference to the conclusion that she ought to have known that this land had no coal on it sufficient in quantity to justify the great expense of mining it and working it. But charity suggests *per contra,* that she was a widow, aged and ill, and lacking, it may be, that acumen and experience in business which would have led to suspicion, and from suspicion to investigation and discovery of the facts. We may leave out of mind the wise saws which admonish us that there are "none so blind as those that will not see," and "where ignorance is bliss, t'is folly to be wise," for her knowledge or her ignorance cuts no figure in this action, when the law is applied to the facts as they clearly appear. [Bigelow on Fraud, 510; Beach v. Bemis, 107 Mass. 498; Proctor v. Spratley, 78 Va. 254; Merwin v. Arbuckle, 81 Ill. 501; Dunn v. White, 63 Mo. 181.]

What she said, the record shows was true; or if false, is excused as permissible puffing. If actionable misrepresentations smacking of fraud were made, she had no physical part in making them; St. John and Noyes made them. St. John and Noyes were her agents. They are so named and referred to in the option contract of January 15, 1903. There the proposition is made to them "as the agents of Mrs. A. B. Halderman." Mrs. Halderman accepted this proposition, and it was the foundation of all subsequent dealings. Its terms, and particularly its lack of absolute binding force upon plaintiffs, all characterize it as an option, and not as a mutual binding agreement, or contract to buy and receive conveyance of, and to sell and convey, real estate. Plaintiffs had the option to refuse to meet any payment and as a penalty to lose what they had paid at any given time and so render the writing null and void. [Glass v. Rowe, 103 Mo. l. c. 539.]

St. John speaks of having an option which defines the attitude in which he and Noyes stood toward Mrs. Halderman in carrying this deal through, and the agreement of November 24, 1903, which was executed by all parties to this action (both plaintiffs and defendants, except Ross), stipulates that plaintiffs shall pay to St. John and Noyes the sum of $10,000, which shall be in full of all their claims for commission in making such sale as stipulated "in the option they [St. John and Noyes] hold from the said party of the first part [Mrs. Halderman];" yet no one in the case saw fit to put into it, either this option itself, or any certain and definite information as to the exact attitude in which St. John and Noyes stood toward Mrs. Halderman in making this trade. They are said in the documents to be "agents" in one place and the "holders of an option" in another; they are found claiming a ten per cent commission on the gross purchase price, and again in a controversy with Mrs. Halderman over the payment thereof. Later they commute

their commission for $10,000 in cash, which Mrs. Halderman compelled the plaintiffs to pay, and St. John accepts from plaintiffs the payment of his expenses in procuring extensions for plaintiffs' sole behoof.

Thus, anomalous upon the proof in the record is the attitude of St. John and his partner. Since, however, they made the trade as agents upon a commission basis; since originally the amount of this commission depended on the amount of purchase price and on the actual payment of the latter; since we hold the paper of January 15, 1903, was nothing but an option; since the deal was not consummated and plaintiffs concluded and the commission earned till November 24, 1903, and since the defendant Halderman accepted the benefits of what St. John and Noyes did, we think it fairly clear, that neither the facts nor the law will allow the defendants to deny the agency of St. John and Noyes during the whole of the time of the making of and concluding the deal, and until its final consummation by the binding agreement of sale, made November 24, 1903. Defendant Halderman may not ratify this sale, accept and keep the money flowing from it; make the sale a basis of a claim for legal relief, and then be heard to disavow the men, or the means, by which the bargain was made. [Millard v. Smith, 119 Mo. App. 701; Wann v. Scullin, 235 Mo. 629.] Nor are the questions of whether St. John and Noyes were agents of Mrs. Halderman, and whether Mrs. Halderman had part or parcel in the alleged false representations by which plaintiffs aver themselves to have been lured to their great financial hurt, either seriously controverted or strenuously urged by learned opposing counsel. These questions are but flotsam and jetsam, touching which, however, in passing we give our findings. On the crucial and controlling questions of fact, the special judge *nisi* made the below finding:

"Without attempting to review the evidence in detail, my conclusions are as follows:

"1st. That the agents St. John and Noyes untruly stated the extent and results of previous explorations of the coal.

"2nd. That it has not been satisfactorily shown that these statements were made with the knowledge of their falsity or in bad faith.

"3rd. That Ryan and Magenheimer relied to some extent on the statements, which were as to matters of fact, in making the original contract of purchase.

"4th. That Ryan and Magenheimer made a partial examination of the property in the summer and fall of 1903, and discovered substantial inaccuracies in the representation that had been made to them.

"5th. That when the sale was closed by the delivery of the deed in the fall of 1903, the plaintiff through its officers and promoters were aware that the extent of the coal had been greatly exaggerated.

"6th. That the plaintiff company continued its operations for about a year thereafter until it was conclusively demonstrated that the property had little or no value for mining purposes."

In the main we agree with these findings of the learned special judge. Something of amplification or explanation, it may be, can be added from the testimony, to the second of these findings of fact, with fairness.

It is pretty clear that if St. John and Noyes did not know the falsity of what they said they ought to have known it; and their lack of knowledge was not from the lack of opportunity for knowledge. Their statements pass beyond the mere pale of trade "puffing." If these statements were not made with knowledge of their falsity, they were made with a reckless abandon and a total disregard of whether they spoke truly or falsely, which the ages of St. John and Noyes and the fear of the grave should have blunted and tem-

pered—not to the shorn lamb, because this record is singularly free from lambs.

Amending then this finding by appending thereto and making it read: *"But St. John and Noyes could not have believed on any reasonable grounds that their statements were true,"* we think the learned special judge found well, fairly, ably. In addition to this, certain well-recognized canons of decision admonish us to defer, where the testimony is contradictory and conflicting, to the finding of the chancellor. ˙ Mathias v. O'Neill, 94 Mo. 1. c. 530.]

II. The logic of the law and therefore the law itself, has been, as is just and to be expected, slightly colored by the inherent physical difficulties of looking beneath the soil and the rocks of the earth and of seeing the mineral wealth as nature placed it, or oftener, *failed* to place it. So that just a little relaxation of the more stringent rules applicable to cases of alleged fraud, where the subject-matter may be seen, is found in those rules when they come to be applied in testing an alleged fraud in the sale of a mine. That relief will be accorded is well settled, but upon what facts and conditions?

**False Representations: Actual Knowledge.**

The case of Southern Development Co. v. Silva, 125 U. S. 1. c. 250, lays down succinctly, in a case similar to, and almost on allfours with, the instant one, these necessary concomitants of relief, to-wit:

"In order to establish a charge of this character the complainant must show by clear and decisive proof—

"First. That the defendant has made a representation in regard to a material *fact;*

"Secondly. That such representation is false;

"Thirdly. That such representation was not actually believed by the defendant, on reasonable grounds, to be true;

"Fourthly. That it was made with intent that it should be acted on;

"Fifthly. That it was acted on by complainant to his damage; and,

"Sixthly. That in so acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true.

"The first of the foregoing requisites excludes such statements as consist merely in an expression of opinion or judgment, honestly entertained; and, again (excepting in peculiar cases), it excludes statements by the owner and vendor of property in respect to its value."

In the view which we are forced by the facts to take of this case, we need not weigh with extra delicate nicety, whether St. John and Noyes knew the falsity of the statements which both financially interested and disinterested, but biased witnesses, say that they made: *In effect, that it was tested and proven coal land; that the coal underlay the whole of the* 5000 *acres of land clear to the railroad.* If this were all that is involved in the case it might well suffice to say that the actual knowledge of the falsity of the misleading statements is not, by the great weight of authority, an absolutely necessary element in equity in order to justify rescission of a contract for fraud, where the actionable statements are made recklessly, or made under such circumstances as that, from these circumstances knowledge will be inferred either from the duty to know, or from the opportunity afforded for acquiring knowledge; present other requisite elements. [14 Am. & Eng. Ency. Law (2 Ed.), 93; Glasscock v. Minor, 11 Mo. 655; Hubbard v. Weare, 79 Iowa, 678; Florida v. Morrison, 44 Mo. App. 529; Bishop v. Seal, 87 Mo. App. 256; Hamlin v. Abell, 120 Mo. 188; Walsh v. Morse, 80 Mo. 568; Caldwell v. Henry, 76 Mo. 254.] To say this, is to do no more than to say that the representations were not actually believed by defend-

ants to be true on reasonable grounds.  This view is in no wise inconsistent with the well-considered rule enunciated in the Silva case, supra.

Much confusion seems to exist in the several jurisdictions as to the elements which are necessary to bring about rescission in equity.  Some, if not all, of this confusion seems to arise from a failure to distinguish between the tort, deceit, and fraud, in equity. It ought to be true, and we find that it is in fact true, that from the greater harshness of the law and from its lack of flexibility, as compared to equity, much stronger proof of *scienter,* as well as intent, is required to make out actionable deceit, warranting recovery, than is required in a case in equity when timely and providently begun.

We need not, however, discuss intent or *scienter,* either actual or that implied from reckless statement, or that inferable from the duty to know, or from the circumstances imputing knowledge, unless we find (a) that plaintiffs acted on the misrepresentations of St. John and Noyes, being ignorant of the falsity thereof, and reasonably believing such misrepresentations to· be true, and (b) that the rescission was made in a timely way without such delay as implied laches.

Magenheimer and Ryan saw the Stover Coal Bank, under the guidance of Noyes (St. John was not present), on January 15, 1903, and on the evening of the same day made the pencil memorandum offer to buy; "taking a flyer" as Ryan expresses it.  Magenheimer and Ryan, a little more than five weeks thereafter, organized the plaintiff corporation in Dakota, with three million dollars of capital, *full-paid,* although until December 15, 1903, not one cent's worth of property of any sort was owned by it, and although not till August 2, 1904, could it legally hold property of any sort in Missouri.  After December 15, it had but a bare equity in the Halderman lands arising from the sev-

eral instalments paid on the purchase price. (Plaintiffs say this was $39,500; we can figure out but some $25,000. The correct amount is not vital here.) Plaintiffs then began endeavoring to sell stock in this $3,000,000 corporation, which had not a cent's value of property, and to this end issued a misleading and most flamboyant prospectus. Plaintiffs Magenheimer and Ryan (Morgan County Coal Company had no part or interest herein, except that which rested in the ultimate intention, known to Mrs. Halderman's agents, to convey the property to it, if purchased, when purchased) sent Collier down to inspect the property for them. He did so and made a report to plaintiffs in which he says among other rosy statements collated to entrap investors: "I doubted the statement of the seventy-two-foot veins. I had the satisfaction of seeing for myself and found the statement to be true in every particular. There is no doubt about its being the best coal proposition in the country." Plaintiffs sent Griever to inspect this property. He did so for them, and after glowingly characterizing what he saw as "a magnificent work of nature," further reported: "There seems to be no doubt this same vein of coal extends north to the Rock Island railroad and the same coal is mined from six to seven miles west of the tunnel" (referring by the word "tunnel" to the Stover Coal Bank, probably). Plaintiffs sent Tom Ryan, who was experienced as a coal miner, to inspect this land. He reported that "the coal veins comprise about 5000 acres, known as the Halderman tract. This includes the great Stover Coal Bank, which has an almost national fame; and thus far stands out as the thickest body of bituminous coal yet discovered in the United States, with seventy or more feet of as good bituminous coal as any in the west. It extends southward for about a mile and northward to the Rock Island survey." Plaintiffs also sent James Taylor, a mining expert, and at the time the State Mine Inspec-

tor of the State of Illinois, who in a report to plain-
tiffs, which they went to the trouble to have copy-
righted, says: "It is impossible to estimate the value
of this coal-producing property.  While practically,
it is a pocket, yet it is a magnificent one, ranging from
fifty to seventy-five feet in thickness of the best bitu-
minous coal.  *I found no difficulty in tracing it for a
distance of seven miles in a southern direction, extend-
ing six miles from east to west."*  Plaintiff Ryan was
himself an experienced coal mine operator.  He with
George Keirstead spent many weeks looking over this
land. . Kierstead found that two or three shafts show-
ing coal were not on this land; that, to use his own
language, "I found out the whole thing was chaos from
start to finish, from the first time I put my fingers on
it."  Plaintiffs largely, if not wholly (except for finan-
cial reasons), on account of Kierstead's report of con-
ditions to them, got a sixty days' extension within
which to pay the $25,000 due August 14, 1903, and to
further examine the land.  This extension was gotten
August 27, 1903, and provided among other things, as
will be noted, "that Magenheimer and Ryan shall
have the privilege of developing coal and mineral on
said 5111 acres, in such place and in such manner as
in their judgment may be best for all parties con-
cerned.  The Stover Coal Bank is not included in this
privilege, but shall remain intact."  Following this,
plaintiffs put Kierstead in charge of investigating the
land.  He cleaned out all old shafts; sunk other shafts,
and put down seven drill holes.  One of these shafts
he sunk right by the Stover Coal Bank.  Later, plain-
tiffs sent one Griffith, spoken of as "a distinguished
engineer and coal mining expert," to examine this
land.  Of him, Magenheimer, after bearing tribute to
his ability, said *that upon Griffith's report depended
whether they would buy the land or not.*  Griffith's re-
port, as detailed by Magenheimer, did not justify pur-
chasing the land, and from it plaintiffs learned that

St. John had misrepresented the extent of the coal toward the north. This, in addition to the numerous misrepresentations called to plaintiff's attention by Kierstead. From this Magenheimer felt constrained to write Mrs. Halderman the letter of October 12, 1903, in which he says the investigations have been far from satisfactory and that *"on the north part the work done has proved that coal does not exist in quantities, or quality to justify operating as a commercial proposition."* Plaintiff Ryan was told by the witness Duzan *"of the various drillings that had been made."* So, Ryan knew as much of the result of those drillings as did St. John and Noyes, if we grant to them full knowledge. Ryan asked if the Stover Bank was not worked through in one place, and being told it was, *he requested Duzan to cover up this place with slack, so as to hide it.* All this in August, 1903. Magenheimer wrote St. John in February, 1903, that he had been told that this identical land could have been bought for $12.50 an acre—thirty-five dollars an acre less than plaintiffs actually agreed to give for it; but says Magenheimer, *"We do not care for this, if we can have the time and chance to swing this we will do so upon the inspection and report of our Mr. Taylor."* Later, we find Magenheimer, at a time when plaintiffs' investment in the land totaled $500, writing St. John that he proposed to strip off some of the ground, *"so we can tell people that we are in operation; that will help us sell the stock, and very rapidly."*

Thus and more the means of independent inspection on plaintiffs' part. Plaintiffs took conveyance of the land and executed the notes and deed of trust in question, on December 15, 1903, exactly eleven months after they first got the option to buy. In these eleven months, as we have seen, they had seven expert coal operators, mining engineers or coal-mining experts to inspect, or drill, or sink shafts on this land (for three months or more without let or hindrance in fact).

Can it be said, under these facts, that there was such reliance on the misrepresentations of St. John and Noyes as will justify a decree of rescission? In other words, were the misrepresentations of St. John and Noyes acted on, or did plaintiffs act upon their own exhaustive and careful examination?

In the case of Shappirio v. Goldberg, 192 U. S. l. c. 241, it is said:

"There are cases where misrepresentations are made which deceive the purchaser, in which it is no defense to say that had the plaintiff declined to believe the representations and investigated for himself, he would not have been deceived. [Mead v. Bunn, 32 N. Y. 275.] But such cases are to be distinguished from the one under consideration. When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent the party from using them, and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor."

To the same effect is the case of Southern Development Co. v. Silva, 125 U. S. 247; Farrar v. Churchill, 135 U. S. l. c. 615; Slaughter's Admr. v. Gerson, 80 U. S. (13 Wall.) 379; and Atwood v. Small, 6 Cl. & F. (H. of L. Cases) 232. The latter case, which was a case of alleged fraud (and a bill to rescind therefor) in a sale of an iron smelter and a colliery, is almost on allfours with the case at bar. Our own courts require reliance on representations as a condition precedent to relief. [Powell v. Adams, 98 Mo. l. c. 604; Jones v. Rush, 156 Mo. 364.] In the case of Farrar v. Churchill, 135 U. S. l. c. 615, the court said:

"If the purchaser investigates for himself and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representations. [Southern Devel-

opment Company v. Silva, 125 U. S. 247.] 'If the party to whom the representations were made,' remarked Lord LANGDALE, in Clapham v. Shillito, 7 Beavan, 146, 149, 'himself resorted to the proper means of verification, before he entered into the contract, it may appear that he relied on the result of his own investigation and inquiry, and not upon the representations made to him by the other party; or if the means of investigation and verification be at hand, and the attention of the party receiving the representations be drawn to them, the circumstances of the case may be such as to make it incumbent on a court of justice to impute to him a knowledge of the result, which, upon due inquiry, he ought to have obtained, and thus the notion of reliance on the representations made to him may be excluded.' "

The nature of this property considered; the fact that plaintiffs had spent more months, so far as the record shows, than St. John and Noyes had spent hours in inspecting this land for coal, make it difficult to say, as a matter of law upon the facts, that plaintiffs relied upon the statements of the agents of defendant Halderman.

Touching the peculiar legal nature of mining propositions or land sold for ore and mineral exploitation, the Illinois Supreme Court said in a well-considered case:

"No man, however scientific he may be, could certainly state how a mine, with a most flattering outcrop or blowout, will finally turn out. It is to be fully tested and worked by men of skill and judgment. Mines are not purchased and sold on a warranty, but on the prospect. 'The sight' determines the purchase. If very flattering, a party is willing to pay largely for the chance. There is no other sensible or known mode of selling this kind of property. It is, in the nature of the thing, utterly speculative, and everyone knows the business is of the most fluc-

tuating and hazardous character. How many mines have not sustained the hopes created by their outcrop!'' [Tuck v. Downing, 76 Ill. 71, 1. c. 94.]

III. Did the learned trial judge err in holding that delay in invoking relief had barred relief? Refreshing our recollection of the facts from the statement, in brief we find that for eleven months **Laches.** plaintiffs were not bound to buy this land. That these eleven months were filled with inspections, examinations, acts and facts, which ought to have put any reasonably prudent man upon suspicious inquiry, and which as the record shows, did bring home to plaintiffs such knowledge as ought to have held them back from this trade. After closing. the trade, with all these facts before them, they continued to work and deal and speculate with the property for nearly two years, to-wit, till September 18, 1905, when they brought this action. In the meantime plaintiffs drilled some six or seven hundred acres out of the tract of five thousand acres, and having found the seven hundred acres barren, they aver that all is barren and practically worthless, and sue to rescind.

We may concede, as a matter of proof to make out plaintiffs' case and for the purposes of this suit, that the deductions of plaintiffs are true; that since the seven hundred acres which were pretty thoroughly explored are barren, the whole parcel of five thousand acres is likewise barren and worthless. But as a matter of fact this may not be true. And whether it is true or not, the speculative value of the whole five-thousand-acre tract as a coal and mineral property is absolutely and utterly destroyed. To say that such speculative value is nonexistent and therefore based upon a fraud and that it ought to be destroyed, is to beg the question. It is but to say that since the seven hundred acres have no commercial coal, the remaining four thousand acres likewise have none, and that the

worth of the land lies wholly in its value for a sheep pasture. The phase of the case discussed above shades into the one here involved, that of laches through delay, till the lines of segregation are almost indistinguishable. This from the fact, that at any time for eleven months before the option was foreclosed by plaintiffs and before plaintiffs had absolutely concluded themselves by taking a deed and making and delivering the notes and deed of trust, they could have halted, held back, or withdrawn from their option, with but little hurt to either party. Failing to do so, but continuing to exploit the land for speculative purposes, they are not now entitled to come into equity and ask rescission. They must have acted in a timely way. The length of time may depend on the circumstances. The law not only requires a disaffirmance of the contract at the earliest practicable moment after the discovery of the cheat, but a return of all that has been received under the contract, and a restoration of the other party to the condition in which she stood before the contract was made. [Cobb v. Hatfield, 46 N. Y. 533; Bennett v. Hickey, 112 Mich. 1. c. 383; Grannis v. Hooker, 31 Wis. 474; Krutz v. Craig, 53 Ind. 561; Hunt v. Blanton, 89 Ind. 38, in this last case upon the facts, five months was held to be too long a delay; Shappirio v. Goldberg, 192 U. S. 1. c. 242; Grymes v. Sanders, 93 U. S. 62, 1. c.; Watson Coal & Mining Co. v. Casteel, 68 Ind. 476; Kinne v. Webb, 49 Fed. 512.]

In the case of Shappirio v. Goldberg, supra, the court, through Mr. Justice DAY, said:

"It is well settled by repeated decisions of this court that where a party desires to rescind upon the ground of misrepresentation or fraud, he must, upon the discovery of the fraud, announce his purpose and adhere to it. If he continues to treat the property as his own the right of rescission is gone, and the party will be bound by the contract. [Grymes v. Sanders,

93 U. S. 55; McLean v. Clapp, 141 U. S. 429.] In other words, when a party discovers that he has been deceived in a transaction of this character he may resort to an action at law to recover damages, or he may have the transaction set aside in which he has been wronged by the rescission of the contract. If he choose the latter remedy, he must act promptly, 'announce his purpose and adhere to it,' and not by acts of ownership continue to assert right and title over the property as though it belonged to him.''

Pertinent also is the language of the court in the case of Grymes v. Sanders, supra, l. c. 62, where it was said:

''When a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast-and-loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value. [Thomas v. Bartow, 48 N. Y. l. c. 200; Flint v. Woodin, 9 Hare, 622; Jennings v. Broughton, 5 De G., M. & G. 139; Lloyd v. Brewster, 4 Paige, 537; Saratoga & S. R. R. Co. v. Row, 24 Wend. 74; Minturn v. Main, 3 Seld. 220; 7 Rob. Prac., c. 25, sec. 2, p. 432; Campbell v. Fleming, 1 Ad. & El. 41; Sugd. Vend. (14 Ed.) 335; Diman v. Providence, W. & B. R. R. Co., 5 R. I. 130.]''

Our own court has long held and enunciated very similar views, as will be found in the below excerpts and in these cases: Dougherty v. Stamps, 43 Mo. l. c. 247; Hart v. Handlin, 43 Mo. l. c. 175; Lewis v. Land Co., 124 Mo. 672; Key v. Jennings, 66 Mo. l. c. 370;

Taylor v. Short, 107 Mo. l. c. 392; Estes v. Reynolds, 75 Mo. 563; Jarrett v. Morton, 44 Mo. 275; Bushnell v. Loomis, 234 Mo. l. c. 382; Wood v. Telephone Co., 223 Mo. l. c. 565; Brown v. Mining Co., 231 Mo. l. c. 173.

In the case of Estes v. Reynolds, supra, SHERWOOD, J., speaking for this court, said:

"It is fatal to plaintiff's case, that on discovering the alleged fraud and deceit upon which he bases his action, he did not promptly rescind, or offer to rescind the contract, and return or offer to return the property he acquired by reason thereof. And such rescission must be *in toto*. A party cannot affirm a contract in part, and repudiate it in part. He cannot accept its benefits on the one hand, while he shirks its disadvantages on the other. He cannot play fast-and-loose in the matter. Nor is he permitted to select his own time, consult his own convenience and watch the rise and fall of the market, before exercising the right of rescission. If he elects to disaffirm the contract in consequence of deception practiced upon him, such election in order to avail him must have the chief and essential element of promptitude, and he must put the other party in the same situation as he was before the contract was made. All the authorities speak this language. [Jarrett v. Morton, 44 Mo. 275; Hart v. Handlin, 43 Mo. 171, and cases cited.]"

Pertinent also and *apropos* to the point at bar, is what is said by SHERWOOD, J., in the case of Taylor v. Short, supra, viz.:

"Whenever, upon discovery, he does treat the matter in the latter way, either by waiving the fraud in express terms or impliedly by continuing to deal with the property or proceeds emanating from that fraud, then the right to rescind is gone. Negotiations or dealings with the fraud-feasor, respecting the subject-matter of the fraud after discovery, are fatal to the right of repudiation. 'The right to rescind a contract must be exercised as soon as any one of the

events which give rise to the right happens, or is known to the person entitled to it. Thus, in the case of a transaction grounded on fraud, the party deceived must, on the discovery of the fraud, elect to rescind or to treat the transaction as a contract. . . . Nor will the right to rescind revive merely because of the subsequent discovery of some incident of the fraud, or other ground on which the right arises, which was not known at the time of the waiver; so where in a transaction based on fraud the purchaser did not immediately on the discovery of the fraud repudiate the contract, but on the discovery of a further circumstance of fraud sought to do so, he was held incapable then of rescinding the contract.' "

This doctrine seems to be well-nigh universal. Upon the facts, we are not able to see any right in appellants to rescind at the time and under the circumstances. The learned trial judge took the proper view of this case upon these questions. We are, however, not unwilling for plaintiffs to pursue their action at law, if, these views considered, they are so advised, and if by law they are so allowed from facts, it may be, which are not before us. To this end, and in this view, it is probable, that defendant Halderman ought not to have judgment for her notes; since it may happen, that the fund represented by these past-due notes may be needed as matters of offense, or defense, somewhere in the action at law, if such shall be begun. Defendant Halderman may foreclose her deed of trust, thus paying these and other notes, if she is so advised. We need not reverse the case for this modification, but since the facts are before us we may affirm and render a modified judgment, which we do.

It is therefore considered and adjudged by the court that plaintiffs' bill herein be dismissed, and that they take nothing by this their suit, without prejudice, however, to the right and privilege of plaintiffs to bring their action at law, if so permitted otherwise,

and if so advised; it is further ordered and adjudged that the first and second and third counterclaims of defendants and each of them be dismissed, without prejudice to defendants in anywise to sue thereon in another action, or to foreclose their deed of trust securing the notes which form the subject-matter of said counterclaims, in anywise they are by law, or by the terms thereof permitted, according as defendants may be advised, and that defendants have and recover of and from plaintiffs all their costs herein by them laid out and expended and that execution issue therefor. *Lamm, C. J., Graves, Brown, Bond* and *Walker, JJ.*, concur; *Woodson, J.*, dissents in separate opinion.

WOODSON, J.—I dissent from the majority opinion in this case for the reason that during the negotiations of the contract of sale and purchase of the land in controversy, the agents of respondents made to appellants certain material misrepresentations regarding the area and quantity of coal underlying the same; also that they were made for the purpose of and did influence the latter in purchasing the lands.

The trial court found, and, if I correctly understand the opinion filed herein, it holds that the purchasers relied *somewhat* upon those representations as being true, and of course to that extent were influenced and induced to enter into the contract of purchase. But, however that may be, in my opinion the record discloses those facts, and the mere fact that the appellants reserved the right (for extra precaution, because of the large sum of money involved) to investigate the lands and the minerals alleged to have been concealed therein, did not, in my opinion, waive their right to also rely upon said representations.

Coal Co. v. Halderman.

In such transactions they enter into and form a part of the contract as if they had been embodied therein. In other words, those representations were nothing more nor less than a part and parcel of the consideration upon which the contract of sale was based, which can always be shown by parol evidence, as was done in this case. That being indisputably true, then I am at a loss to conceive by what process of sound reasoning it can be contended that the appellants waived that part of the consideration by reserving and exercising the right to make investigation for themselves, and especially in cases like this, where large tracts of land are sold because of the mineral alleged to have been buried therein.

It is no defense to appellant's complaint for respondents to say, "Granting all you claim, yet you took eleven months in which to investigate the alleged coal deposits and therefore you should have discovered that the representations were false, and unworthy of belief."

In reply to that, it may be truthfully said, as contended for by counsel for appellants, that no man or set of men, at any reasonable expense could, in that length of time, make a thorough investigation of the minerals imbedded, as it was alleged these were, beneath five thousand one hundred and eleven acres of land, eight square miles, and acquire a knowledge of the approximate amount of coal thereon.

Moreover, the record shows that as a matter of fact they acquired no such knowledge and that they still relied upon the representations, and executed the contract agreeing to pay fifty-five dollars per acre for the entire 5111 acres, aggregating $281,105 which the evidence shows was not worth one-fourth of that sum, if the representations were not true.

I have no patience with a person who makes false and fraudulent representations in order to induce another to enter into a contract, and, after doing so,

contends that under the circumstances he should have known better, and consequently should pocket his loss without complaint.

If the representations are strong enough to induce the other party to part with his gold, then when the falsity is disclosed, the law should compel the liar to disgorge.

I am, therefore, of the opinion that the judgment should be reversed and the cause remanded to the circuit court for a new trial.